743 So.2d 1275 (1999)
STATE of Louisiana
v.
Tuan TRAN.
No. 98 KA 2812.
Court of Appeal of Louisiana, First Circuit.
November 5, 1999.
*1278 Tony Clayton, Dale R. Lee, Asst. Dist. Attys., Baton Rouge, LA, for State of Louisiana.
Martin E. Regan, Jr., New Orleans, LA, for Defendant-Appellant.
BEFORE: SHORTESS, PARRO, and KUHN, JJ.
SHORTESS, J.
Tuan Tran (defendant) was charged by grand-jury indictment with one count of second-degree murder, along with Trung Tran, Thach Nguyen, and Hien Phi Hoang. La.R.S. 14:30.1. He pled not guilty and, after solo trial by jury, was found guilty as charged. He was sentenced to life in prison without benefit of parole, probation, or suspension of sentence. He has appealed, urging five assignments of error.

FACTS:
On the night of June 27, 1997, the victim, Christopher McDaniel, was at Club Neo, a teen club in East Baton Rouge Parish, with his twin sister and some friends. During the evening, defendant entered the club with three other Vietnamese men. At some point words were exchanged *1279 between the victim, who was on the dance floor, and one or more of the Vietnamese men who were seated next to the dance floor. Without warning, defendant threw a cue ball at the victim, rushed the victim, and a fight ensued.[1] During the fight, the victim was stabbed multiple times. When the fight was stopped, defendant and the three other Vietnamese men left the club and drove away in two separate vehicles. The victim collapsed in the club and died shortly thereafter as a result of the stab wounds.
After receiving information from a confidential informant, the East Baton Rouge Parish Sheriffs Office was able to contact Thach Nguyen, one of the men involved. Thach gave a statement regarding the crime and his involvement therein. Thach also informed the sheriffs office as to the whereabouts of the other three men involved in the crime, including defendant and his brother, who were subsequently arrested in Houston, Texas.

ASSIGNMENT OF ERROR NUMBER ONE:
Defendant contends Thach was arrested without probable cause and his statement, made as a result or that illegal arrest, should have been suppressed. A detailed consideration of this assignment of error is unnecessary because defendant has no standing to raise this issue. A person adversely affected by a confession unlawfully obtained from another has no standing to raise its illegality in court. State v. Burdgess, 434 So.2d 1062, 1064-65 (La.1983); State v. Beach, 610 So.2d 908, 912 (La.App. 1st Cir.1992), writs denied, 614 So.2d 1252 (La.1993) and 94-1942 (La.11/11/94), 644 So.2d 389. See State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, 144, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996). This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER TWO:
Defendant contends the trial court erred in failing to grant a mistrial. The trial court granted a pretrial motion in limine prohibiting the State from using the word "gang." However, when Sergeant Steve Wallis of the East Baton Rouge Parish Sheriffs Office was asked who arrested defendant, his response included the word gang. Defendant contends the use of this word was highly prejudicial and served only to inflame the jury. He asserts that because an admonishment would only have accented the prejudicial comment of the witness, his motion for a mistrial should have been granted.
A police officer is not a court official within the meaning of Louisiana Code of Criminal Procedure article 770. State v. Watson, 449 So.2d 1321, 1328 (La.1984), cert. denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 952 (1985). Therefore, the applicable provisions of Code of Criminal Procedure article 771 apply. State v. Pooler, 96-1794, p. 38 (La.App. 1st Cir.5/9/97), 696 So.2d 22, 48, writ denied, 97-1470 (La.11/14/97), 703 So.2d 1288. Code of Criminal Procedure article 771 provides, in pertinent part:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
. . . .
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.

*1280 In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
A mistrial under the provisions of Code of Criminal Procedure article 771 is at the discretion of the trial court and should be granted only where the prejudicial remarks of the witness make it impossible for the defendant to obtain a fair trial. State v. Jack, 554 So.2d 1292, 1296 (La.App. 1st Cir.1989), writ denied, 560 So.2d 20 (La.1990). Unsolicited and unresponsive testimony is not chargeable against the State to provide a ground for mandatory reversal of a conviction. State v. Jack, 554 So.2d at 1296. Furthermore, a statement is not chargeable to the State solely because it was in direct response to questioning by the prosecutor. While a prosecutor might have more precisely formulated the question that provoked a witness's response, where the remark is not deliberately obtained by the prosecutor to prejudice the rights of the defendant, it is not the basis for a mistrial. State v. Pooler, 96-1794 at 32, 696 So.2d at 45.
The defense filed a motion in limine asking the court to limit reference to the "ATF Asian Organized Crime Task Force" as being highly prejudicial and inflammatory. According to the minutes included in this record, the court allowed the State to use the phrase "Asian Task Force" but not the phrase "Gang Task Force."
Subsequently, during the prosecutor's direct examination of Wallis, the following colloquy occurred:
Q. [by the prosecutor] So where were they actually arrested?
A. [by Wallis] They were arrested in Houston, Texas.
Q. By Houston Police Officers?
A. Well, the Asian Gang Task Force in
At this point, defense counsel objected, and the court sustained the objection. A discussion was held out of the presence of the jury wherein defense counsel argued that the use of the word "gang" was highly prejudicial and inflammatory and asked for a mistrial. The prosecutor responded that he thought Wallis blurted out the word gang. The prosecutor previously had spoken with the Houston Police officers and asked them not to use that word. The prosecutor asserted there was no intent to show that defendant was in a gang, and the use of this word was not solicited by the State.
The court denied the motion for mistrial, stating that although the State apparently failed to instruct Wallis not to use the word gang, the court felt any prejudice that arose from the use of the word was minimal at this point. The court stated there had been no emphasis on any allegations of gang activity, and it did not think the "mere mention of the phrase Asian Gang Task Force would necessarily create prejudice in the minds of the jury and certainly would not warrant granting of a mistrial." The court then instructed Wallis not to make any references to the word gang. The court further noted defense counsel did not request an admonition but it felt an admonition would draw more attention to Wallis's comment.
There was no showing of clear prejudice to defendant by Wallis's use of the phrase "Asian Gang Task Force," and there was no indication defendant was unable to obtain a fair trial because of his statement. Furthermore, Wallis's use of the word gang was not deliberately obtained by design of the prosecutor to prejudice the rights of defendant. Consequently, Code of Criminal Procedure article 771 does not mandate a mistrial. For the foregoing reasons, this assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER THREE:
Defendant contends the trial court erred in curtailing his cross-examination of Wallis relative to his misidentification of defendant twelve days before trial. In his brief *1281 to this court, defendant contends the trial court violated his fundamental right to cross-examine the witness when he was precluded from asking Wallis about this pretrial misidentification of him.
An accused has the right to confront and cross-examine the witnesses against him, but that right is not unlimited or absolute. The law is well settled that the scope of cross-examination is not limited to matters covered in direct examination; a witness may be cross-examined upon the whole case. However, the scope and extent of cross-examination rest largely in the discretion of the trial court, and its rulings will not be disturbed absent an abuse of discretion. State v. Thames, 95-2105 (La.App. 1st Cir.9/27/96), 681 So.2d 480, 485, writ denied, 96-2563 (La.3/21/97), 691 So.2d 80. Additionally, it is well-settled law that the defense should be allowed substantial freedom in cross-examining State witnesses. Such freedom may be restrained by the trial court, however, when the questions asked are irrelevant or immaterial to the case. Similarly, a defendant's right to present a defense is sanctioned constitutionally, and he can testify to or give evidence on any matter relevant to an issue material in the case. A "material issue" is one that is "of solid or weighty character, of consequence, or importance" to the case. State v. Bourg, 615 So.2d 957, 961 (La.App. 1st Cir.1993).
Louisiana Code of Evidence article 401 provides:
"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
Code of Evidence article 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. In questions of relevancy, much discretion is vested in the trial court. Such rulings will not be disturbed on appeal in the absence of a showing of manifest abuse of discretion. Bourg, 615 So.2d at 961.
During the pretrial hearing on defendant's motion to suppress, Wallis testified he investigated this case. Wallis discussed a statement given by Thach and Thach's identification of defendant as the assailant. Wallis testified he had received information from a confidential informant or Thach that defendant and his brother were involved in this crime and that defendant was the person who actually stabbed the victim. Wallis discussed Thach's videotaped statement and testified that during the statement, Thach spelled out defendant's name as there was some confusion among the officers conducting the interview because of pronunciation differences. Wallis then testified that according to the information he had received, defendant was the taller and older of the two brothers and he was also the person who threw the cue ball at the victim. Defense counsel then asked Wallis to point to defendant, and Wallis pointed to defendant's brother.
Wallis testified at defendant's trial that he arrived at the scene after the crime occurred and was at the scene only momentarily. Wallis again testified regarding information received from Thach and the confidential informant that subsequently led to defendant's arrest as the assailant. During defense counsel's cross-examination of Wallis, the following colloquy occurred:
Q. [defense counsel] And you've been in court and you've testified about this case relating to motion hearings and preliminary hearings and bond reduction hearings and things of that nature haven't you?
A. [Wallis] Yes, sir.
Q. And you've had occasion to make a determination based upon the information that you have in your possession *1282 from the witnesses and from this information and from all the other information that you've been able to gather who is the person that did the stabbing in this particular case, correct?
A. Yes, sir.
Q. We were in court just twelve days ago, weren't we, in this particular case?
A. Yes, sir.
Q. And the information that you had I asked youbased upon all the informationbased upon all the information that you have, you believe that this person sitting right here is the person that did the stabbing, is that correct?
A. Yes, sir.
Q. Isn't it true that twelve days ago you picked out
At this point, the prosecutor objected. A hearing was held out of the presence of the jury. After much discussion between defense counsel, the prosecutor, and the court, the court sustained the prosecutor's objection, stating that the issue at the motion to suppress was whether there was probable cause to arrest defendant. The court stated it was "hard pressed to see the relevance of that ... even assuming that he picked out someone other than the defendant." The court then inquired as to the relevance this testimony had to whether the witnesses who actually observed the crime identified defendant. Defense counsel responded that on more than one occasion, Wallis identified the person who went outside the club and then who fought with the victim as being the one who was taller and older. Defense counsel wanted to point out that Wallis and Thach did not communicate well. After more discussion, the prosecutor stated he felt this misidentification had no probative value, and its prejudicial effect outweighed any probative value it may have. The defense counsel responded he felt it was highly probative to Wallis's investigation and his determination of charging and arresting defendant for this crime. The court then stated:
[But that is not the] issue. I mean, obviously, there was some information that they gathered which led to the arrest, not only of this individual, but all four individuals who are alleged to have been involved in this offense. We have already litigated the issue of whether or not they had sufficient information at the time they obtained the warrant for the arrest. I frankly fail to see whether this officer picked out someone other than this defendant, I fail to see how that goes to the ultimate issue of whether or not this is in fact the individual who committed the offense. The only persons who can answer that question are those persons who were present at the time the offense was committed. I frankly don't see the relevance of this officer having pointed to someone other than this defendant.
Defense counsel again argued he was asking the question only for impeachment purposes and not as to the ultimate issue of who committed the crime. The court stated it was going to sustain the objection "at th[at] juncture" but would allow it later if defendant laid a proper foundation. Defense counsel asked if he could ask questions about identifications Wallis received from other eyewitnesses in his investigation. The court responded:
[I]f during the course of the investigation this officer received information concerning the description of the person who is alleged to have been the stabber and if based on that description that he got from the witnesses, if at the motion to suppress he picked out somebody else other than this man, I think he can ask that and I will allow that.
Defense counsel subsequently continued his cross-examination of Wallis wherein he asked about eyewitnesses' descriptions of the assailant. The following colloquy then occurred:
Q. [by defense counsel]: Is there any question in your mind that Trung Tran, the brother of this individual, is substantially taller than him?

*1283 A. [by Wallis]: ... I don't know.
Q. Detective, I'm asking youyou've been in court. You've seen them on numerous occasions haven't you?
A. A couple of times.
Q. And you know because you've seen them and you've been asked the question who's the taller individual and you've given an answer to that haven't you?
A. Yes, sir.
Q. And you had said that the taller individual is without a doubt Trung, the brother, Trung Tran, correct, the taller out of these two?
. . . .
A. He is taller.
Q. So it would not be consistent with the information that you have regarding the height of Trung Tran and the height of Tuan Tran that the taller individual went outside?
A. Mr. Manasseh, I can't answer it that way.
Defendant's counsel then asked Wallis about his testimony at a hearing twelve days earlier regarding descriptions of the perpetrators of the crime.
According to the trial transcript, defense counsel elicited testimony from Wallis regarding the physical descriptions provided to the police and discrepancies between the physical descriptions and the statements provided to Wallis that defendant was the person who stabbed the victim. Defense counsel asked about the previous hearing and about Wallis's testimony during that hearing.
Which brother Wallis identified at a pretrial hearing is not relevant to the trial. At the hearing, Wallis testified defendant was the taller and older brother and stated defendant appeared to him to be the taller and older of the two brothers. Then, when asked to identify defendant in the courtroom, Wallis identified defendant's brother. According to testimony adduced at trial, defendant's brother is the taller of the two men, but defendant is older. Therefore, neither brother was taller and older.
Moreover, Wallis's identification was not relevant to the crime. Wallis was not a witness to the crime. He based his pretrial identification on information received from witnesses, some of whom specifically named defendant as the assailant. Wallis's misidentification was not relevant to any material issue in the case. Furthermore, any probative value of testimony by Wallis regarding his pretrial misidentification of defendant would have been substantially outweighed by its prejudicial effect, as the jury may have been led to believe Wallis was a witness to the crime and made a subsequent misidentification based on what he observed as a witness. There was no indication in the trial transcript that anyone other than Wallis confused the two brothers.
The court did not curtail the defense's cross-examination of Wallis. Defense counsel thoroughly cross-examined Wallis on matters that were in the purview of his knowledge, including the investigation and witnesses' statements and identifications. According to statements made by the court, it appeared the court would have allowed questioning as to Wallis's misidentification if defense counsel had laid the proper foundation. Considering the above, we do not find the trial court abused its discretion in limiting defendant's cross-examination of Wallis. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER FOUR:
Defendant contends the trial court erred in admitting the English version of a statement he gave orally in Vietnamese without sufficient indication that he reviewed and adopted the contents of the statement. Defendant asserts he had a limited comprehension of the English language. He claims that the officers failed to determine if he comprehended the typed English version of his statement and *1284 that he was prejudiced by the admission of the incorrect non-adoptive statement.
At both the hearing on the motion to suppress and the trial, Houston Police Officer Tony Nguyen testified that upon defendant's arrest and after being given his Miranda rights in English and Vietnamese, defendant freely and voluntarily gave a statement to Nguyen regarding his involvement in this crime. Defendant told Nguyen he could speak English but would prefer to use Vietnamese because he would feel more comfortable. He told Nguyen he had completed ten years of school. According to Nguyen, defendant understood the English Nguyen spoke.
As defendant gave his oral statement in Vietnamese, Nguyen simultaneously typed the statement in English. According to Nguyen, the written statement was a "verbatim recitation" of what defendant said. Nguyen stopped throughout the statement to ask defendant to clarify certain portions of his statement. Nguyen read the statement to defendant in Vietnamese and asked defendant if he wanted to change anything; defendant told him he did not want to make changes. Defendant did not read the statement to Nguyen. Nguyen was not present when defendant signed the statement.
At both the hearing on the motion to suppress and the trial, Sergeant Russell Dunlap of the Houston Police Department testified he was present when Nguyen read defendant his rights in both English and Vietnamese. Dunlap admitted he was not present the entire time when defendant gave the statement to Nguyen, but he heard Nguyen ask defendant to clarify his statements. The majority of defendant's statement was given in Vietnamese but some things were said in English.
According to Dunlap, defendant freely, voluntarily, and without threats or promises gave a statement to Nguyen. Defendant's constitutional rights were listed at the top of his typed statement, followed by a statement that he voluntarily waived those rights. Defendant indicated he understood each of those rights and wrote his initials to the left of each constitutional right listed. He also wrote his initials next to the statement that he voluntarily waived his rights.
Dunlap asked defendant to read the first line of the statement out loud. Dunlap had defendant read only the first line of the statement to him, rather than the entire statement. According to Dunlap defendant read fluently in English. Dunlap signed the document, and defendant signed the document in his presence. Dunlap asked defendant if that was his statement end if he understood it. It appeared to Dunlap that defendant read the entire statement to himself. He felt defendant could understand what he was reading. Dunlap and another officer then signed the statement. Dunlap explained that he signed the statement as a witness to defendant's signature. He did not recall defendant making any corrections to the statement.
Dunlap testified Nguyen typed while defendant dictated his statement. According to Dunlap, it was customary procedure for Nguyen to translate a defendant's statement into English. Dunlap admitted he did not have personal knowledge of what defendant said because he did not understand Vietnamese.
At trial, defendant admitted giving an oral statement to Nguyen regarding his involvement in the incident. He stated Nguyen typed his statement as he spoke. During his trial testimony, defendant read his entire statement aloud in English. He admitted that the majority of the statement was correct, but he testified he did not say certain things and some of the terminology was not accurate.
Code of Evidence article 801(D) provides, in pertinent part:
Statements which are not hearsay. A statement is not hearsay if:....

*1285 (2) Personal, adoptive, and authorized admissions. The statement is offered against a party and is:
(a) His own statement, in either his individual or a representative capacity;
(b) A statement of which he has manifested his adoption or belief in its truth; or
(c) A statement by a person authorized by him to make a statement concerning the subject.
It appears from the record, the court did not make a ruling at the motion-to-suppress hearing regarding this statement as the court allowed defense counsel the opportunity to present additional evidence. However, during the trial, after testimony out of the presence of the jury from Nguyen and Dunlap, the court allowed the statement into evidence as an adoptive statement of defendant, "although it may not be a precise or an exact translation from Vietnamese into English." The court stated it was satisfied defendant was given the opportunity to read the English version of his statement and had read the first sentence of the statement in English to satisfy Dunlap that defendant understood and could read English. The court stated defendant's signature to the statement manifested his adoption of that statement as his own. The court further stated it understood there were nuances in language that could not be translated perfectly from one language to another, but it was satisfied defendant was given an adequate opportunity to review the statement as it appeared in English. The court felt that the signature on the document was sufficient to manifest an adoption of that document and that the officer went even further by having defendant read a portion of the statement to him in English.
The statement did not offer any new evidence and merely corroborated Nguyen's testimony. The statement was exculpatory as defendant denied he was the assailant. Defendant indicated that he understood English, that the officer read the statement back to him, that he read aloud part of the statement, that he was instructed to and given the opportunity to read the entire statement, and that he signed the statement. Furthermore, defendant read the statement aloud at trial, which indicated he was able to read and understand the statement. Considering the above, we find the trial court did not err in allowing the statement into evidence. This assignment of error is without merit.

ASSIGNMENT OF ERROR NUMBER FIVE:
Defendant contends the evidence was constitutionally insufficient to support the jury's second-degree murder verdict in light of the inconsistent testimony of the witnesses. Defendant contends this case was based on the uncorroborated, inconsistent, and self-serving statements of two co-defendants, and several witnesses could not identify him as the person fighting with the victim. In the alternative, defendant argues this incident was a barroom brawl and the jury erred in not returning a verdict of manslaughter.
The standard of review for the sufficiency of evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the State proved the essential elements of the crime beyond a reasonable doubt and the defendant's identity as the perpetrator. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); see also La. C.Cr.P. art. 821; State v. King, 563 So.2d 449, 456 (La.App. 1st Cir.), writ denied, 567 So.2d 610 (La.1990). State v. Johnson, 461 So.2d 673, 674 (La.App. 1st Cir.1984). Where the key issue raised by the defense is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. State v. Richardson, 459 So.2d 31, 38 (La.App. 1st Cir.1984). This court will not assess the credibility of witnesses or reweigh the evidence to overturn a factfinder's determination of guilt. State v. *1286 Polkey, 529 So.2d 474, 476 (La.App. 1st Cir.1988), writ denied, 536 So.2d 1233 (La. 1989). The trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Johnson, 529 So.2d 466, 473 (La. App. 1st Cir.1988), writ denied, 536 So.2d 1233 (La.1989).
The applicable definition of second-degree murder in this case is the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm." La.R.S. 14:30.1(A)(1). Specific criminal intent is the "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act" La.R.S. 14:10(1). Specific intent may be proved by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. State v. Lutcher, 96-2378, pp. 16-17 (La.App. 1st Cir.9/19/97), 700 So.2d 961, 973, writ denied, 97-2537 (La.2/6/98), 709 So.2d 731.
Wallis testified that he was the investigating officer and that he received information from a confidential informant regarding this crime that enabled him to locate Thach at his residence. Thach subsequently gave a statement wherein he admitted he was at the club the night of the crime. Thach told Wallis his version of the events that night and informed him the other three men involved in the crime could be located in Houston, Texas.
According to Wallis, Thach's statement was consistent with the evidence found at the scene but was inconsistent with statements from other witnesses at the scene, who claimed all four men ran toward the victim. Thach told Wallis that defendant and his brother fought the victim and that he stayed back and did not have anything to do with the fight. Thach stated defendant stabbed the victim and later showed him a small bloody knife. Defendant also told Thach he stabbed the victim.
Wallis testified Thach stated defendant owned a white car. Wallis later learned the car actually belonged to defendant's wife. Thach said he did not ride in the white car that night but rode with Hien to and from the club. He could not describe Hien's vehicle, however.
Thach told Wallis the victim cursed at defendant, used derogatory words, and made gestures indicating he wanted to fight. Thach claimed defendant then went out to the car to get a knife, but Thach did not see a knife before the fight. Thach told him defendant threw the cue ball. Wallis stated at one point that this was the signal to start the fight. Thach did not indicate to him that they went to the club with the intent to fight or commit any crime. Thach claimed he did not fight, but ran. According to Thach, defendant's brother Trung was the tallest of the group.
Wallis also testified he reviewed Hien's statement wherein Hien claimed defendant murdered the victim. Wallis further testified he interviewed witnesses from the club and showed them photographic lineups. The first time, the witnesses were shown a photographic lineup of Asian males that did not include defendant's photo. The witnesses picked no one from that lineup. When his photo was later placed in a lineup, two witnesses picked him as the assailant. Wallis admitted the witnesses were not shown photographs of Hien or Trung. According to Wallis, some of the witnesses interviewed at the crime scene indicated it was the tallest man of the group who went outside, reentered the club, and threw the cue ball.
A videotape recording of Thach's statement was played for the jury wherein Thach stated he went to the club with defendant, defendant's brother, and Hien. While they were at the club, the victim *1287 cursed at them and made gestures to them. He stated Hien asked defendant if he had a knife in his car and told him to get it. Defendant left the club but returned. Defendant then threw the cue ball, and he and his brother fought with the victim. Defendant later told Thach he stabbed the victim and showed him a bloody knife. Thach claimed he did not fight but only watched the fight.
East Baton Rouge Parish Sheriffs Detective Russell Starkey testified he conducted two separate photographic lineups that did not include defendant's photo. No one identified anyone in either lineup as being involved in this crime.
Dr. Juanito Lim, a board-certified pathologist accepted as an expert in forensic pathology, testified he conducted the autopsy of the victim. The victim sustained seven stab wounds. One of the wounds caused the victim to bleed to death and punctured his heart, causing "cardiac tamponade" that prevented his heart from pumping. According to Lim, a wound of this type could cause the victim to die in less than one minute. Lim concluded the wounds were caused by a knife that was at least three and one-half inches long. Lim was unable to find any medical evidence that the victim was struck by a cue ball.
Nguyen testified he received information regarding the crime. There were outstanding arrest warrants for two Asian males, defendant and his brother, Trung Tran. Nguyen later received information the brothers were in an Asian community in Houston. The men subsequently were arrested.
Nguyen advised defendant of his rights, but he waived those rights. He freely and voluntarily, without promises or threats, gave a statement to Nguyen regarding his involvement. According to Nguyen, defendant told him he and his brother went to a Vietnamese pool hall on Florida Boulevard where they met Thach and Thach's friend. Defendant did not know the name of the friend. The four men then decided to go to a teen club to dance. According to Nguyen, after they danced at the club, they sat at a table. Thach told them a group of people were making fun of them and trying to provoke a fight with them. Defendant claimed Thach left the club, went to his car, and returned with a pool ball, a metal stick, and a knife. Thach gave defendant the pool ball and gave his friend the metal stick. Thach did not tell him anything about the knife. Defendant told Nguyen six or seven males on the dance floor were calling them out to fight. All four Vietnamese men went toward the dance floor; defendant threw the cue ball at the men who were dancing, and they began to fight. Defendant told Nguyen a club-security guard broke up the fight, and he left the club along with the other Vietnamese men. They had arrived in two cars and left in the same cars.
Defendant told Nguyen he and his brother returned to the pool hall while Thach and his friend went home. Thach later called them at the pool hall and told him he was at his friend's house. Defendant and Trung stayed at the pool hall for about fifteen minutes and then went home. The following day defendant and his brother went to Houston to their mother's home. Defendant's mother later returned to Baton Rouge and heard her sons were involved in the crime. Defendant testified she called them in Houston, and he told her about the events of the evening in question. His mother then called Thach's home but was told Thach had gone into hiding. Defendant told Nguyen that when his mother returned to Houston, she encouraged his brother and him to go into hiding. He refused. Defendant did not tell Nguyen who actually stabbed the victim and did not tell him who had the knife. Defendant stated Thach and his friend were in a sky-blue Ford station wagon.
Hien testified he was eighteen years old. His parents live in New Orleans, and his sister lives in Houston. He knew Thach, but prior to the incident did not know defendant or Trung. On June 27, 1997, *1288 Hien went to Club Neo with Thach. Defendant and Trung were in a white Oldsmobile. They met at the club, went inside, and danced. One of the Caucasian males began cursing them. According to Hien, defendant ran up to the victim and started hitting him, and Trung jumped into the fight. Hien stated the fight was quickly broken up by the club owner. Hien testified that after they walked out the door, defendant told him he stabbed the victim. He identified defendant in court as the person who told him he stabbed the victim. Hien denied he fought inside the club. He stood near the fight and saw defendant run up to the victim.
After leaving the club, Hien and Thach went home for a while. Thach called defendant at the pool hall. Thach wanted to go to the pool hall to find out what happened, so Hien drove him there. Hien testified defendant told him not to tell anyone about the incident. He stated he did not stab the victim and did not fight with the victim or anyone else that night Subsequently, Hien left Baton Rouge to help his brother-in-law in Houston. Upon his arrest, Hien voluntarily gave a statement to the Houston police.
Hien read his statement aloud to the jury. The statement corroborated his trial testimony. In the statement, he claimed he and Thach watched the fight. Defendant told them at the pool hall he had stabbed the victim, but Hien did not see a knife. He later heard someone was stabbed at the club and died, but he did not know it was the same person involved in the fight with defendant. In his statement, Hien claimed that a few weeks after the incident he went to his parents' house in New Orleans and then to Houston with a church group. He stayed in Houston at his sister's house. While in Houston, he got a message the police wanted to talk to him. That same night the police arrested him at his sister's house.
Hien did not see defendant throw a cue ball. He claimed defendant ran up to the victim. According to Hien, defendant jumped on the victim first, and then Trung got involved in the fight. He and Thach did not fight. He did not stab the victim himself, nor did he see who actually stabbed the victim and even know there had been a stabbing until defendant told him. Defendant did not show him a weapon. Hien did not believe defendant had stabbed the victim until after he was arrested. When he heard someone had been stabbed at a club and died, he did not know it was the same club.
Christy McDaniel, the victim's twin sister, testified she was at the club with the victim that night. Sometime thereafter, Christy was shown a photographic lineup of Vietnamese males but was unable to positively identify any of the men as the assailant. Christy saw four Vietnamese men rush her brother, but only one man fought with him. The other three men did not fight. She stated her brother fought back and tried to defend himself. The fight did not last very long. After the fight was broken up, the four Vietnamese men left the club. The victim stumbled and fell face first against some stairs. When Christy and her friends turned her brother over, they saw he was bleeding. They raised his shirt and saw stab wounds. Christy made an in-court identification of defendant as the person who fought with the victim.
Christy testified it was unusual for the Vietnamese men to be in the club. She stated they were dancing and acting "goofy," and her brother mimicked the men's dancing. She did not hear him curse the men, nor did she hear one of the Vietnamese men curse her brother's girlfriend. Christy did not see her brother or any of his friends make any fighting gestures toward defendant or the other Vietnamese men.
Christy admitted she had been drinking alcohol that night and thought the victim might have had one drink before the incident. She testified it was dark in the club, but she was able to see. She did not see *1289 anyone throw a cue ball at the victim, and she did not see a weapon. She was 100% sure defendant was the assailant.
Wendy Clouatre, the victim's girlfriend, testified she was with him at the teen club on the night of the crime. She had an alcoholic drink before going to the club, and she saw the victim drink peppermint schnapps. She did not see anyone drinking in the club, and the victim did not leave there. While they were in the club she noticed four Vietnamese men enter the club; she had not seen them in the club before. Some of the Vietnamese men sat in chairs by the dance floor and some danced.
According to Clouatre, the victim said, "[F____] the Chinese" to defendant and his friends because they were staring at the victim's friends. The Vietnamese men did not do anything or approach the victim after the victim made that statement. It did not appear to her that the Vietnamese men heard the victim's comment, and she and the victim continued to dance. Clouatre did not see the victim make any gestures toward the Vietnamese men. She did not see the victim motion toward the men as if he wanted to fight, although he did gesture to her to dance with him. At the time he gestured to her, the Vietnamese men were close to where she was standing. The men did not rush him after he made that motion to her, however, and the victim continued to dance.
Clouatre did not see the victim do anything to provoke the fight. According to Clouatre, she and the victim were talking when "out of the blue" the four Vietnamese men attacked him. She explained that four men "rushed" him, but only one fought with the victim because their friends stopped the other men. Clouatre did not see any weapons, but she saw defendant punch the victim in the stomach area. She was not aware the victim was being stabbed. After the fight was over, she saw the victim stagger and fall. She and her friends turned the victim over, discovered the stab wounds, and tried to stop the bleeding.
Clouatre stated the lights in the club were dim but good enough to see. She testified the victim was "minding his own business" when the incident occurred. Clouatre estimated the fight occurred about thirty minutes after the victim cursed about defendant and his friends and about fifteen minutes after he gestured for her to dance with him. Clouatre did not see anyone get hit by a cue ball.
Later, Clouatre was shown a photographic lineup; she picked defendant from the lineup as the person who stabbed the victim. Clouatre immediately recognized defendant. She also identified defendant in court as the person who fought with defendant. She testified she was 100% sure he was the person who stabbed the victim.
Anthony Delhommer testified he was at the club with the victim on the night of the incident. The victim did not appear to be intoxicated; he was dancing and having fun. Delhommer saw the four Vietnamese men enter the club, sit down, and dance periodically. Delhommer then saw the four Vietnamese men stand up. One of the men threw a cue ball that hit the victim on the forehead, which surprised Delhommer. Immediately after the cue ball was thrown, the four men ran toward the victim. Delhommer ran to help the victim. According to Delhommer, only one of the Vietnamese men got to the victim. The fight lasted about thirty seconds before it was stopped.
Delhommer indicated he was not drinking on the night of the crime, and the victim did not appear to be intoxicated. Delhommer did not see the victim mimicking the Vietnamese men, nor did he hear the victim make any sort of racial slur toward them. He did not see the men ask any of the girls in their group to dance, nor did he see the Vietnamese men plotting together. According to Delhommer, the victim stumbled backward when he was hit with the cue ball, and the four men *1290 then rushed him. Delhommer grabbed one of the Vietnamese men and kept him from jumping on the victim. Delhommer did not see a weapon.
Delhommer picked defendant out of a photographic lineup as the person who stabbed the victim. In a separate photographic lineup, Delhommer picked a photograph of Thach Nguyen as one of the persons in the club and indicated he was positive defendant was the assailant. In court, Delhommer testified defendant was the person he saw fighting the victim.
Defendant testified he was twenty-two years old at the time of the trial. According to defendant, the morning of the crime he had gone to the probation office to transfer his probation to Houston; he planned to move there because his family lived there. That night, defendant and his brother went to the Vietnamese pool hall on Florida Boulevard where they played pool. While at the pool hall, he saw Thach, who was his brother's friend, and Thach told them about the teen club. They went to the club and sat in chairs next to the dance floor.
Thach went out to the dance floor to dance. He saw Thach dancing by some girls and then saw Thach talking to a tall white male. Thach returned to the area where they were sifting and told defendant someone called him a "chink" and wanted to fight him. Defendant stated he was not mad or upset because the words were not said to him. Thach sat down next to defendant, and defendant asked him if they sold drinks. Thach said yes, so defendant gave Thach one dollar to buy water. Defendant later saw Thach walk into the club from outside. Thach returned with the water and handed defendant a cue ball. Defendant put the cue ball in his pocket. Defendant also saw Thach give something to Hien.
The Caucasian male then came over and talked to Thach. Hien was on one side of Thach, and Trung was on the dance floor. Defendant testified the Caucasian male approached Thach and said, "[C]ome on, Chink, come out and dance with me." The man did not say anything to Hien, but Hien was upset and told them to "come over and [f____] with" him. Hien stood up when a group of six or seven white males approached Thach. Defendant was unable to hear everything that was said because the music was too loud. He was scared and nervous because he thought there was going to be a fight. Defendant stood up and was concerned about protecting himself so, when he felt the cue ball in his pocket, he threw it at the ground in order to scare the men. Defendant wanted the men to step back so he could run away; but the men continued coming toward them. Defendant saw Hien jump the victim, and Thach went to help. Defendant was going to help Thach and Hien, but someone hit him. He tried to hit back, but he was thrown out of the club.
Defendant saw Hien leave the club and put something in his pants. They left the club, but his brother went back inside to get his hat. Defendant and his brother then returned to the pool hall. Thach called defendant at the pool hall. He later went home and went to sleep. Defendant and his brother left for Houston the following evening. After arriving in Houston, they stayed at the home of their father's friend for about one month and then moved one block away because it was too noisy at the first house. He and his brother were later arrested by the police in Houston.
Defendant stated he did not see Thach with a knife. He denied he made that statement to Nguyen. According to defendant, his brother is the tallest of the four men. Defendant also testified his mother encouraged him to go into hiding, but he did not want to because he did not kill the victim.
Defendant then read aloud to the jury the statement he had given the Houston police after he was arrested. The statement corroborated defendant's trial testimony. In his statement, he indicated Hien *1291 was at the pool hall with Thach before they went to the teen club. He stated Thach went outside and returned with a pool ball, a metal bar, and a small knife. Thach gave him the pool ball and gave Hien the metal bar, which he hid. The victim and his friends called them out to the dance floor to fight, and defendant threw the pool ball at them. They then all began to fight. Defendant stated he was hit during the fight. When the fight was broken up, defendant and his brother left and returned to the pool hall. While there, Thach called and told them he was at his friend's house. Defendant and his brother then left the pool hall and went home to sleep.
On cross-examination, defendant admitted he previously had been convicted of four counts of simple burglary and was on probation at the time the crime was committed. He claimed he gave his probation officer his address in Houston. Defendant did not see who stabbed the victim, but he claimed Hien was the person fighting with the victim. Defendant threw the cue ball at the floor and did not throw any punches in the fight. He denied walking outside the club. He stated that Thach was lying when he claimed defendant showed him a knife and that Hien was lying when he testified defendant told him he killed the victim. He also thought the other witnesses who identified him as the assailant must have made a mistake. He admitted he did not see Hien or Thach stab the victim. Defendant also denied he read his statement before signing it; he said he signed the statement because he was told to.
Trang Tran, defendant's sister, testified no one told her defendant was wanted in Baton Rouge. According to Trang, defendant moved to Houston after the rest of the family only because he had an appointment with his probation officer. She did not know if her brother killed anyone.
On rebuttal, Roger Fritchie, a probation officer for the State of Louisiana, testified defendant was under his supervision when he was placed on probation. Defendant contacted him in June 1997 to tell him he was leaving Louisiana because he was not able to leave without permission. Defendant violated his probation, however, because the address he gave him in Houston was not the address where he was actually living.
We must now determine whether the State produced sufficient evidence of defendant's guilt of the crime of second-degree murder. Defendant admitted being at the club on the night in question, and he was positively identified by Thach, Hien, Clouatre, and Delhommer as the assailant. The State also presented evidence that defendant stabbed the victim seven times, with one of the wounds causing the victim's death. The number and character of the stab wounds furnishes sufficient evidence to support a finding of the specific intent to kill or inflict great bodily harm required for second-degree murder. That defendant stabbed the victim in the chest with a knife indicates a specific intent to kill or to inflict great bodily harm. See State v. Overton, 596 So.2d 1344, 1357 (La.App. 1st Cir.), writ denied, 599 So.2d 315 (La.1992). Furthermore, a rational trier of fact could have reasonably concluded that the killing was not necessary to save defendant from the danger envisioned by Revised Statute 14:20(1) or that defendant had abandoned the role of defender and taken on the role of aggressor and, as such, was not entitled to claim self-defense. See La.R.S. 14:21; State v. Bates, 95-1513 (La.App. 1st Cir.11/8/96), 683 So.2d 1370. There was no evidence defendant attempted to retreat, and the evidence showed he was the aggressor.
Having found the elements of second-degree murder, the jury then had to determine whether, under the circumstances, the crime was actually manslaughter. Louisiana Revised Statute 14:31(A)(1) provides:
*1292 A. Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed....
The existence of "sudden passion" and "heat of blood" are not elements of the offense but are factors in the nature of mitigating circumstances that may reduce the grade of homicide. Provocation is a question of fact to be determined by the trier of fact. Thus, the issue remaining is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the mitigatory factors were not established by a preponderance of the evidence. Bates, 95-1513 at 13-14, 683 So.2d at 1377-78.
The guilty verdict in this case indicates the jury concluded this was a case of second-degree murder and rejected the possibility of a manslaughter verdict. The guilty verdict demonstrates the jury concluded either: (1) that any initial aggression by the victim or argument between him and defendant was not sufficient provocation to deprive an average person of his self-control and cool reflection; or (2) that an average person's blood would have cooled by the time defendant rushed at the unarmed victim and stabbed him. See State v. Bates, 95-1513 at 14, 683 So.2d at 1378. As the trial court noted in its denial of defendant's motion for post-verdict judgment of acquittal, while there may have been some unkind words used and some meanness shown, it certainly was not sufficient provocation to deprive an average person of his self-control and cool reflection. Furthermore, no testimony was presented that the victim attempted to physically harm defendant. The verdict indicates that, after considering the credibility of the witnesses and weighing the evidence, the jury accepted the testimony of the State witnesses and rejected that of the defense witnesses. This court will not assess the credibility of the witnesses or reweigh the evidence.
A rational trier of fact, viewing all of the evidence as favorable to the prosecution as any rational fact-finder can, could have concluded the State negated any reasonable probability of misidentification and proved beyond a reasonable doubt that defendant was guilty of second-degree murder, and that the mitigatory factors were not established by a preponderance of the evidence. This assignment of error is without merit.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] There was conflicting testimony at trial as to whether all four Vietnamese men rushed the victim, who actually fought with the victim, and whether defendant actually threw the cue ball at the victim or threw it to the floor to get attention.