STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2023 KA 1095

STATE OF LOUISIANA

VERSUS

MICHAEL BROOKS

Judgment Rendered: **NOV 1 3 2024**

* * * * *

On Appeal from the
19th Judicial District Court
Parish of East Baton Rouge, State of Louisiana
Trial Court No. 21-02171

The Honorable Louise Hines, Judge Presiding

* * * * *

Hillar C. Moore, III
District Attorney
Jessica Fogan
Assistant District Attorney
Baton Rouge, Louisiana

Attorneys for Appellee,
State of Louisiana


Lieu T. Vo Clark
Louisiana Appellate Project
Mandeville, Louisiana

Attorney for Defendant-Appellant,
Michael Brooks

* * * * *

BEFORE: WOLFE, MILLER, AND GREENE, JJ.

**WOLFE, J.**

The defendant, Michael Brooks, was charged by grand jury indictment with second degree murder (count one), in violation of La. R.S. 14:30.1, and obstruction of justice (count two), in violation of La. R.S. 14:130.1. He pled not guilty and, following a jury trial, was convicted as charged. The trial court sentenced the defendant to concurrent terms of life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence on count one and ten years imprisonment at hard labor on count two. The defendant now appeals, alleging the evidence was insufficient to support his second degree murder conviction. For the following reasons, we affirm his convictions and sentences.

## FACTS

Around 10:49 p.m. on January 28, 2021, officers with the Baton Rouge Police Department ("BRPD") responded to a Shot Spotter alert[1] at a vacant apartment complex near 5021 McClelland Drive. Officers located a vehicle in the parking lot and discovered the victim, twenty-one-year-old Marquell Wyatt ("Wyatt"), nearby with fatal gunshot wounds. The defendant was developed as a suspect and subsequently arrested after Wyatt's friends described his tumultuous, clandestine relationship with the defendant.

## ASSIGNMENT OF ERROR

In his sole assignment of error, the defendant asserts the evidence presented at trial was insufficient to support his second degree murder conviction. Specifically, the defendant suggests the shooting was committed in sudden passion and in the heat of blood such that the responsive verdict of manslaughter should be entered. He neither contests his identity as the shooter, nor does he contest the sufficiency of the evidence as it relates to his obstruction of justice conviction.

---

[1] According to BRPD Captain Kevin Heinz, a Shot Spotter alert occurs when equipment placed throughout the city detects gunshots and alerts the police to the general location of the gunshots.

A conviction based on insufficient evidence cannot stand, as it violates due process. See U.S. Const. amend. XIV; La. Const. art. I, § 2. The standard of reviewing a claim of insufficient evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the State proved the essential elements of the crime. See **Jackson v. Virginia**, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); **State v. Mellion**, 2021-1116 (La. App. 1st Cir. 4/8/22), 342 So.3d 41, 45, writ denied, 2022-00732 (La. 6/22/22), 339 So.3d 1186, cert. denied, ___ U.S. ___, 143 S.Ct. 319, 214 L.Ed.2d 141 (2022). When circumstantial evidence is used to prove the commission of an offense, La. R.S. 15:438 mandates "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a separate test for evaluating the evidence; rather, all of the evidence, both direct and circumstantial, must be sufficient under **Jackson** to convince a rational juror the defendant is guilty beyond a reasonable doubt. **State v. Cabellero**, 2022-0441 (La. App. 1st Cir. 11/4/22), 356 So.3d 389, 394, writ denied, 2022-01777 (La. 4/25/23), 359 So.3d 982. When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defense, that hypothesis falls, and the defendant is guilty unless there is another hypothesis that raises a reasonable doubt. **State v. Bessie**, 2021-1117 (La. App. 1st Cir. 4/8/22), 342 So.3d 17, 22, writ denied, 2022-00846 (La. 9/20/22), 346 So.3d 802.

Second degree murder is defined, in pertinent part, as a killing committed "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La. R.S. 14:30.1(A)(1). Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a

person. **State v. Welch**, 2019-0826 (La. App. 1st Cir. 2/21/20), 297 So.3d 23, 27, writ denied, 2020-00554 (La. 9/29/20), 301 So.3d 1193. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. **Id.**

The responsive verdict of manslaughter is defined, in pertinent part, as:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

La. R.S. 14:31(A)(1).

The existence of "sudden passion" and "heat of blood" are not elements of the offense but, rather, are mitigating factors that the defendant must establish by a preponderance of the evidence. See **State v. Dearmas**, 2022-0494 (La. App. 1st Cir. 11/4/22), 356 So.3d 9, 14, writ denied, 2022-01839 (La. 5/23/23), 360 So.3d 1254; **Mellion**, 342 So.3d at 45. If a person unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act. **Mellion**, 342 So.3d at 48. Provocation and time for cooling off are determinations made by the fact finder under the standard of the average or ordinary person with ordinary self-control. **Dearmas**, 356 So.3d at 15. Thus, an appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found the defendant did not establish the mitigating factors by a preponderance of the evidence. **State v. Jacquot**, 2023-1254 (La. App. 1st Cir. 6/27/24), 2024 WL 3199218, *3.

In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. Provocation testimony is an issue of credibility. Where there is conflicting testimony about factual matters, the

4

resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. Accordingly, on appeal, this court will not re-assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. **Id.**

At trial, Leonda Guerin ("Leonda"), Wyatt's friend, testified that Wyatt and the defendant were in a romantic relationship at the time of his death.[2] Leonda said Wyatt openly identified as a gay man, but the defendant was closeted and did not want people to know he was gay. Leonda testified, on the day of the incident, she drove Wyatt to a house in Brookstown to deliver a phone for the defendant so he could better communicate with Wyatt. According to Leonda, the defendant, the defendant's girlfriend, and the defendant's brother were outside when she and Wyatt arrived. Leonda said the defendant pulled out a gun "to show off in front of his girl" and acted like he did not know Leonda when she handed him the phone. A few minutes after delivering the phone, the defendant called Leonda while she and Wyatt were driving back to Wyatt's mother's house. Leonda testified the defendant was upset and cursing at her, which angered Wyatt. Leonda said the defendant and Wyatt argued on the phone for a while, and then Wyatt asked Leonda to drive him back to Brookstown to pick up the phone from the defendant. When Leonda refused, Wyatt borrowed a vehicle from his mother and left. She later learned Wyatt had been killed, and she testified that, although she did not see who killed him, she thought the defendant killed Wyatt.

Miazokki Wyatt ("Miazokki"), Wyatt's mother, testified that Wyatt asked her to borrow a vehicle to drive to the store around 10:30 p.m. on the night of the incident. Miazokki said Wyatt was supposed to come right back, and after about fifteen minutes, she began calling and texting him but received no response. Miazokki said she checked Wyatt's location on her phone and saw he was on

---

[2] Given that Leonda and Falonda Guerin have the same last name, we will refer to the witnesses by their first names to avoid confusion.

McClelland Drive, which was two or three miles from their house. Miazokki testified she drove to Wyatt's location, and when she arrived, the police and coroner were already there. After she provided the police with Wyatt's description, she was notified of his death. Miazokki testified she then called Leonda and asked her, "Who killed my son?" According to Miazokki, Leonda immediately provided the defendant's name. Miazokki testified she did not know Wyatt and the defendant were romantically involved at that time.

Falonda Guerin ("Falonda"), Leonda's sister and Wyatt's friend, testified she got a phone call from Wyatt at 10:35 p.m. the night of his murder. Falonda said Wyatt told her he was driving to meet the defendant to get a phone back. While she was on the phone with Wyatt, he said the defendant was calling him and Falonda hung up the phone. Falonda testified she checked Wyatt's location at about 10:37 p.m. and saw he was near McClelland Drive in Brookstown.

Detective Reese Jenkins, a homicide detective with the BRPD, was the lead investigator in the case. Detective Jenkins testified the police recovered eleven shell casings in the immediate vicinity of Wyatt's body, indicating to him that Wyatt was "dropped in [his] tracks" and the perpetrator continued shooting Wyatt after he fell down. Detective Jenkins testified the killing looked personal due to the number of shots fired, the fact Wyatt's cell phone was not taken, and the absence of any signs of a struggle. According to Detective Jenkins, had Wyatt been killed during a robbery, his cell phone would have been stolen and there would have been no reason for the overkill.

Detective Jenkins said he developed the defendant as a potential suspect soon after he interviewed the Guerin sisters and learned of Wyatt's tumultuous on-again, off-again relationship with the defendant. Detective Jenkins testified he was provided with a timeline of Wyatt's activity preceding the murder, which he corroborated with cell phone records. Cell phone records showed at 10:35 p.m.,

6

Falonda called Wyatt and spoke on the phone for a few minutes until Wyatt received a call from a prepaid phone number. Detective Jenkins concluded the prepaid phone number was associated with the phone previously given to the defendant.[3]

On February 1, 2021, Detective Jenkins drafted and obtained a warrant for the defendant's arrest. Detective Jenkins testified before he executed the arrest warrant, he was notified someone placed a 911 call claiming the defendant was armed, wanted for murder, and at the caller's house. The house where the defendant was arrested was a seven-minute walk from the vacant apartment complex where Wyatt was killed. During a search of the house, police recovered ammunition that matched the brands of shell casings found at the crime scene. Detective Jenkins also interviewed the defendant's girlfriend, and according to Detective Jenkins, the defendant's girlfriend corroborated Leonda's statement that Leonda delivered a phone to the defendant.

After being advised of and waiving his **Miranda**[4] rights, the defendant provided a statement to the police. According to the defendant, he knew Wyatt and had "messed with him" two years earlier. The defendant claimed Wyatt tried to "out" him on social media and posted videos of the two engaging in sexual acts. The defendant said, as a result, he was committed to a mental hospital. He denied being in a romantic relationship with Wyatt but said they were amicable and still talked. The defendant said on the day of Wyatt's murder, Leonda drove to his house in Brookstown and tried to give him a phone. He said he did not see Wyatt

---

[3] Detective Jenkins testified his conclusion was based on the information he learned throughout the investigation. The prepaid phone number was saved as a contact in Wyatt's phone earlier that day, and the name of the contact was listed as a blue heart emoji. Several minutes after the contact was created in his phone, Wyatt texted the prepaid phone number "can't wait until you get this phone." That night, Wyatt's call with the prepaid phone number lasted until 10:45 p.m., and the Shot Spotter alert went off a few minutes later. Detective Jenkins said importantly, the prepaid phone number never called Wyatt again.

[4] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

in the vehicle and he did not take the phone because his girlfriend was outside. The defendant denied meeting Wyatt afterwards, and he said he did not kill Wyatt. According to the defendant, Wyatt had a lot of enemies in Brookstown.

Arlisha Brooks ("Brooks"), the defendant's sister, testified she called 911 on February 2, 2021. According to Brooks, the defendant told her he killed "50 Bands" who she said was "[s]ome dude that like[s] dudes."[5] Brooks testified it was her understanding "50 Bands" was killed at the abandoned apartments on McClelland Drive. In the 911 call, which was published to the jury, Brooks said her "neighbor," Michael Brooks, was "the man who killed the man on McClelland," and she said he was in her house, armed with a handgun. Brooks, who identified herself as "Denisha Williams" in the call, said she saw a picture on Instagram that indicated the defendant killed Wyatt.

Dr. William "Beau" Clark, the coroner of East Baton Rouge Parish, was accepted as an expert in emergency medicine and testified regarding Wyatt's autopsy. The autopsy report indicated Wyatt suffered nineteen gunshot wounds, and Dr. Clark testified several of the gunshot wounds were fatal.

On appeal, the defendant argues the evidence supported a verdict of manslaughter as the killing was committed in the heat of passion caused by provocation sufficient to deprive an average person of his self-control and cool reflection. According to the defendant, "Wyatt's actions of bringing [him] a cell phone in front of his girlfriend and family threatened to 'out' [him] as a gay man." The defendant attempts to support his argument that the killing was committed in sudden passion or heat of blood by noting Wyatt was shot nineteen times. We find the defendant's arguments unpersuasive.

The record supports the jury's second degree murder verdict. Though mostly circumstantial, the evidence showed the defendant met Wyatt at the vacant

---

[5] During her testimony, Brooks requested to call her lawyer.

8

apartment complex on McClelland Drive and killed him. Testimony indicated the defendant was angry at Wyatt for giving him the phone in front of his girlfriend and brother as it threatened to reveal their secret homosexual relationship. The Guerin sisters testified Wyatt left shortly before his death to meet the defendant to retrieve the phone. The jury could have reasonably inferred that the defendant killed Wyatt from the testimony and cell phone records showing the defendant called Wyatt mere minutes before the Shot Spotter alert notified the police of the gunshots. The defendant fired at least nineteen shots and disposed of his gun after fleeing the scene, which was a seven-minute walk from his house. Flight following an offense reasonably raises the inference of a "guilty mind." **State v. Rosario-Colon**, 2019-0406 (La. App. 1st Cir. 9/27/19), 289 So.3d 126, 135, <u>writ denied</u>, 2019-01806 (La. 1/28/20), 291 So.3d 1055, <u>cert. denied</u>, ___ U.S. ___, 140 S.Ct. 2727, 206 L.Ed.2d 859 (2020). Further, Brooks testified the defendant confessed to killing Wyatt.

A reduction of second degree murder to manslaughter requires the killing be committed in sudden passion or heat of blood *immediately* caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31(A)(1) (emphasis added). While the defendant claims he was provoked by Wyatt's actions which threatened to "out" him, the evidence showed hours passed between the time Wyatt gave the defendant the phone and the time he was killed. There was no allegation Wyatt threatened the defendant with physical harm. Nothing in the moments immediately leading up to the shooting established the defendant had been provoked by Wyatt to the extent a reasonable person in the defendant's position would have lost his self-control. <u>See</u> **State v. Tran**, 98-2812 (La. App. 1st Cir. 11/5/99), 743 So.2d 1275, 1292, <u>writ denied</u>, 99-3380 (La. 5/26/00), 762 So.2d 1101. Even accepting the defendant's assertion that Wyatt threatened to "out" him as a gay man, it is well-settled that mere words or gestures,

however offensive or insulting, will not reduce a homicide from murder to manslaughter. See **Mellion**, 342 So.3d at 47. Moreover, the number of gunshot wounds is not necessarily indicative of a killing committed in sudden passion or heat of blood. **Id.** at 46.

The jury's verdict reflects it clearly found the defendant failed to meet his burden of proving the mitigating factors by a preponderance of the evidence. **Dearmas**, 356 So.3d at 18; **Mellion**, 342 So.3d at 47-48. We find such determination was not irrational based on the evidence. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the trier of fact and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. See **State v. Calloway**, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). Viewing the evidence in the light most favorable to the prosecution, we find a rational trier of fact could have found the defendant failed to show by a preponderance of the evidence that he acted in sudden passion or heat of blood to justify the lesser verdict of manslaughter. This assignment of error is without merit.

## PATENT ERROR

Pursuant to La. Code Crim P. art. 920(2), this court routinely conducts a review of all appeals for error discoverable by mere inspection of the pleadings and proceedings and without inspection of the evidence. **State v. Anthony**, 2023-0117 (La. App. 1st Cir. 11/3/23), 378 So.3d 766, 775, writ denied, 2024-00027 (La. 5/21/24), 385 So.3d 242. After a careful review of the record, we have found one patent error.

The transcript reflects after the trial court imposed the defendant's sentences, it advised he had "two years to apply for post conviction relief[.]"[6] The prescriptive period for filing an application for post-conviction relief is two years after the judgment of conviction and sentence become final under the provisions of La. Code Crim. P. arts. 914 or 922. See La. Code Crim. P. art. 930.8(A); **State v. LeBoeuf**, 2006-0153 (La. App. 1st Cir. 9/15/06), 943 So.2d 1134, 1142, writ denied, 2006-2621 (La. 8/15/07), 961 So.2d 1158. Nevertheless, the trial court's failure to correctly advise the defendant of the prescriptive period has no bearing on the sentence and is not grounds to reverse the sentence or remand for resentencing and the article does not provide a remedy for an individual defendant who is not told of the limitations period. **LeBoeuf**, 943 So.2d at 1142. Out of an abundance of caution and in the interest of judicial economy, we advise the defendant La. Code Crim. P. art. 930.8 generally provides that no application for post-conviction relief, including applications that seek an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence have become final under the provisions of La. Code Crim. P. arts. 914 or 922. **Id.**

Accordingly, we affirm the defendant's convictions and sentences.

**CONVICTIONS AND SENTENCES AFFIRMED.**

---

[6] The minutes, however, reflect the trial court correctly advised the defendant he had "two years from the finality of the judgment of conviction and sentence" to seek post-conviction relief. When there is a discrepancy between the minutes and the transcript, the transcript prevails. **State v. Lynch**, 441 So.2d 732, 734 (La. 1983).